UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BONCHON LLC,<br><br>Plaintiff,<br><br>-v-<br><br>LKRG PROVISIONS & HOLDINGS, LLC d/b/a FRONTIER FOOD GROUP,<br><br>Defendant. | 20cv3938 (DLC)<br><br>OPINION AND ORDER |

APPEARANCES:

For plaintiff and counterclaim defendant Bonchon LLC:
Kevin Michael Shelley
Kaufmann Gildin & Robbins LLP
767 Third Ave, 30th Floor
New York, NY 10017

For defendant and counterclaim plaintiff LKRG Provisions & Holdings, LLC d/b/a Frontier Food Group:
Andrew C. Lang
Steven Jay Harfenist
Harfenist Kraut & Perlstein
3000 Marcus Ave, Suite 2e1
Lake Success, NY 11042

DENISE COTE, District Judge:

Bonchon LLC ("Bonchon") and LKRG Provisions & Holdings, LLC d/b/a Frontier Food Group ("Frontier") dispute whether an agreement was a binding contract that obligated Bonchon to purchase certain quantities of food products from Frontier. Plaintiff Bonchon has moved for summary judgment on its claim for a declaratory judgment that it did not breach the agreement,

contending that the agreement was not a binding and enforceable contract between Bonchon and Frontier. Defendant Frontier has moved for summary judgment on a counterclaim for breach of contract, premised on its assertion that the agreement was enforceable and Bonchon breached it by failing to make purchases as required by the agreement. For the following reasons, Bonchon's motion for summary judgment is granted.

**Background**

The following facts are derived from the parties' submissions in connection with their cross-motions for summary judgment. Any facts in dispute are construed in favor of Frontier, unless otherwise noted.

Bonchon is a national restaurant chain. Some Bonchon locations are owned and operated by Bonchon directly, and the company also licenses its intellectual property to franchisees. Frontier is a food wholesaler that manufactures products for restaurant chains. The purchases of food items that are sold in Bonchon restaurants are made through three distributors (the "Distributors"). The Distributors purchase food items from producers like Frontier and then resell them to individual Bonchon restaurants.

In 2019, Bonchon's corporate chef, Henry Balle, met with Frontier's co-founders and principals, Ricardo Garcia and Lauren

Kenworthy. After that meeting, Frontier staff then prepared several food items for evaluation by Bonchon. In an email of August 20, 2019, Balle informed Kenworthy and Garcia that Bonchon wished to offer five Frontier products in its restaurants (the "Frontier Products"): diced bacon, bulgogi (a sliced steak product), vegetable dumplings, pork dumplings, and pork belly.

On August 22, Frontier delivered to Bonchon a document that it had prepared entitled "Frontier Food Group & Bonchon Supply Agreement" (the "Supply Agreement" or "Agreement"). The document began with the following language:

> Frontier Food Group is pleased to offer the following supply and pricing agreement to Bonchon.
> Pricing is effective August 22, 2019 -- December 31, 2020.
> Note: Ribeye for Bulgogi pricing effective thru February 28, 2020. To be requoted based on market.

For each of the Frontier Products, the Supply Agreement set forth the price per case, the amount of product contained in each case, and the "Estimated Volume" to be delivered annually. The Supply Agreement also acknowledged that the Frontier Products would be distributed to Bonchon restaurants via the Distributors, and that Frontier would supply to each Distributor

the Frontier Products for a "sales trial." Kenworthy and Balle signed the Supply Agreement on August 26, 2019.[1]

After Kenworthy and Balle signed the Supply Agreement, Kenworthy completed five spreadsheets provided by Bonchon -- one for each Frontier Product -- that contained certain additional information about storage and shipping. These spreadsheets refer to an average monthly volume of cases to be shipped to the Distributors but do not include language indicating that the Distributors were, in fact, obligated to purchase that average monthly volume. Indeed, the spreadsheets contemplate a minimum order of as few as one case at a time.

On September 6, Bonchon instructed the Distributors to place an initial order for the Frontier Products, and over the course of that month, the Distributors submitted purchase orders to purchase a total of 2,161 cases of the Frontier Products at a total price of $151,863.80.[2] In response to these orders, Frontier produced the quantity ordered and continued to manufacture the Frontier Products even after the orders had been fulfilled, manufacturing an additional 4,010 cases of the

---

[1] The parties dispute whether Balle had actual or apparent authority to enter contracts on behalf of Bonchon. The cross-motions for summary judgment may be resolved without addressing this factual dispute.

[2] Frontier does not dispute that it was paid for these orders.

Frontier Products. Effective September 19, Frontier made two modifications to the Supply Agreement, reducing the estimated annual volume of vegetable dumplings from 80,000 pounds to 40,000 pounds and the price of bulgogi from $5.85 per pound to $5.65 per pound.[3] While Balle acknowledged the changes in an email to Kenworthy, neither Balle nor any other representative of Bonchon initialed or signed the modified Supply Agreement.

Bonchon's franchisees, however, were reluctant to purchase the Frontier Products from the Distributors and on November 20, Bonchon informed Frontier that the Distributors would not be purchasing additional inventory of the Frontier Products at that time. In an email of November 21, Kenworthy informed Bonchon that "[Frontier] will not produce anymore [sic]" of the Frontier Products and that it was her understanding "Bonchon will continue to purchase what is produced and in inventory" at the Distributors.

Between November 2019 and January 2020, Bonchon and Frontier made efforts to find buyers for the unsold Frontier Products that had already been produced but not purchased by the Distributors. These efforts proved largely unsuccessful, and on January 28, 2020, Bonchon's supply chain director informed

[3] While the Agreement provided that the bulgogi price could be modified, it also provided that there would be no adjustment to the bulgogi price before February 28, 2020.

Frontier that Bonchon "need[ed] to discontinue [Frontier's] items" based on "lack of movement on this product." Frontier ultimately sold its remaining inventory of the Frontier Products at a significant loss.

Bonchon filed this declaratory judgment action on May 21, 2020. Frontier brought its counterclaim on July 17. In its counterclaim, Frontier alleged that the Supply Agreement obligated Bonchon to purchase food supplies with a total value of $2,100,300.00, reflecting the prices of the products set forth in the amended Supply Agreement and the estimated volumes listed in the amended Supply Agreement.[4] The parties cross-moved for summary judgment on May 7, 2021, and the cross-motions for summary judgment became fully submitted on May 28.[5]

**Discussion**

A court may only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact

---

[4] In her November 20, 2020 deposition, Kenworthy represented that Frontier's ultimate calculation of damages would be reduced to approximately $1.65 million, accounting for the $151,863.80 of Frontier Products purchased by the Distributors and the amendments to the Supply Agreement. In its submissions in conjunction with the cross-motions for summary judgment, Frontier suggests that it is entitled to at least approximately $205,000 in damages associated with the 4,010 cases it sold at a loss.

[5] On September 9, 2021, this case was reassigned from the Honorable Vernon Broderick to this Court.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists where the evidence is such that a reasonable jury could decide in the non-movant's favor." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). "A fact is material if it might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).

A court addressing a motion for summary judgment "must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth., 11 F.4th 55, 61 (2d Cir. 2021) (citation omitted). "Ordinarily, where cross-motions for summary judgment are filed, a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Cayuga Nation v. Tanner, 6 F.4th 361, 373 (2d Cir. 2021) (citation omitted).

Bonchon's sole claim in this litigation is for a declaratory judgment that the Supply Agreement was not a binding and enforceable agreement between it and Frontier, so before turning to the merits, the Court briefly assures itself of

Bonchon's standing to sue.[6] See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to [the] Court's subject matter jurisdiction, it can be raised sua sponte."). A plaintiff has standing to pursue a declaratory judgment action when the dispute is

> 'definite and concrete, touching the legal relations of parties having adverse legal interests' and is 'real and substantial,' such that it 'admits of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'

Saleh v. Sulka Trading Ltd., 957 F.3d 348, 354 (2d Cir. 2020) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)). This principle gives Bonchon standing here. Bonchon and Frontier have a concrete dispute over Bonchon's obligations under the Supply Agreement -- indeed, Frontier answered Bonchon's request for declaratory relief with a counterclaim for damages stemming from Bonchon's purported breach of that

---

[6] This Court otherwise has subject matter jurisdiction in this diversity action. See 28 U.S.C. § 1332(a). Bonchon LLC is a limited liability company whose sole member is Bonchon U.S.A., Inc., a New York corporation with its principal place of business in New York. Frontier is a limited liability company with two members, who are individuals domiciled in Arkansas. See Carter v. HealthPort Technologies, LLC, 822 F.3d 47, 60 (2d Cir. 2016) ("[T]he citizenship of a limited liability company is determined by the citizenship of each of its members."). Bonchon's potential liability under the Supply Agreement also exceeds $75,000.

agreement -- and a declaratory judgment in favor of Bonchon conclusively resolves that dispute between the parties.

I. Legal Framework

This case presents a breach of contract claim: Frontier has moved for summary judgment on the grounds that Bonchon breached its obligation to purchase the full quantity of Frontier Products set forth as the estimated annual volume in the Supply Agreement, while Bonchon seeks a declaratory judgment that it has not. Under New York law,[7] to prevail on a breach of contract claim, a party must demonstrate "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." Moreno-Godoy v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted). The issue presented by the parties' cross-motions primarily implicates the first element of a breach of contract claim -- whether the Supply Agreement constituted an enforceable contract in which Bonchon agreed to purchase certain quantities of the Frontier Products at defined prices.

[7] "The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 152 (2d Cir. 2016) (citation omitted).

"An enforceable agreement consists of an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." Estates NY Real Estate Services LLC v. City of New York, 125 N.Y.S.3d 79, 84 (1st Dep't. 2020). Critically, "the parties must provide a manifestation of mutual assent sufficiently definite to assure that they are truly in agreement with respect to all material terms." NRP Holdings LLC v. City of Buffalo, 916 F.3d 177, 199 (2d Cir. 2019) (citation omitted). "In determining whether mutual assent has been shown, courts look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." Id. (citation omitted). "Under New York law, whether a binding agreement exists is a legal issue, not a factual one." Vacold LLC v. Cerami, 545 F.3d 114, 123 (2d Cir. 2008).

II. Analysis

The Supply Agreement was not a binding agreement because its objective language -- as well as the parties' actions -- does not reflect an intent to be bound. First, the Supply Agreement does not include the "terminology of binding contract." Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491, 499 (S.D.N.Y. 1987) (Leval, J.). It does not include language such as "legally valid and binding obligation," "firm commitment," or "binding agreement," which

courts have held to be indicative of an intent to be bound. Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 96-97 (2d Cir. 2007) (citation omitted). Instead, the prefatory language in the Supply Agreement describes the Agreement as an "offer" to Bonchon.

Moreover, the Supply Agreement is unenforceable because it does not reflect agreement on all material terms. Material terms are those that are "necessary in order to lend an agreement sufficient detail to be enforceable by a court." Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 58 (2d Cir. 2017). In the context of a purported contract for the sale of goods like the Supply Agreement, the agreement "must contain terms such as the quantity of goods to be sold and the price at which they will be purchased." Id.

Several material terms are absent from the Supply Agreement. For instance, the Supply Agreement omits the quantity of the Frontier Products to be purchased by Bonchon. While it lists the "Estimated Volume" of the Frontier Products to be supplied annually -- and Frontier now claims that the Agreement required Bonchon to purchase the full estimated volume -- the Agreement explicitly describes that volume as an estimate rather than a commitment by Frontier to produce that volume or by Bonchon to purchase that volume.

Nor does the Supply Agreement make clear who is obligated to purchase the Frontier Products. Bonchon LLC, the plaintiff and counterclaim defendant in this action, does not itself purchase from suppliers the food served in Bonchon restaurants: rather, the Distributors purchase the food products from suppliers and resell them to Bonchon franchisees. The Supply Agreement does not make clear which, if any, of those potential counterparties are legally obligated to make purchases from Frontier.

Even the price term was subject to change. Frontier sent Bonchon a revised Supply agreement in September 2019 with altered prices. No one from Bonchon signed that amended document.

Finally, while less critical than core terms such as the quantity or prices of goods to be delivered or the identities of the parties bound by the agreement, the absence from the Agreement of terms that would ordinarily be found in a contract between sophisticated actors in the food service industry weighs against a finding that the Supply Agreement included all material terms. These absent terms include shipping and quality control requirements for the Frontier Products.[8]

---

[8] By contrast, the purchase orders submitted by the Distributors contained the material terms absent from the Supply Agreement, including the price, the quantity, the identity of the

Frontier's course of dealing also weighs in favor of a conclusion that the Supply Agreement was not binding. Its current litigation theory is that, once Balle signed the Supply Agreement, Bonchon was bound to purchase the full estimated annual volume of Frontier Products as set forth in the Supply Agreement. But Frontier unilaterally changed prices and quantities listed in the Supply Agreement within a month of its execution. This course of dealing is more consistent with Bonchon's understanding of the Supply Agreement as a non-binding offer. While Frontier may now regret its business decision to anticipatorily produce 4,010 additional cases of the Frontier Products in expectation of future orders from the Distributors, that regret does not turn the non-binding language of the Supply Agreement into a contract.

Frontier's arguments in favor of the enforceability of the Supply Agreement are unconvincing. Frontier suggests that the Agreement bound Bonchon because Bonchon's distributors purchased Frontier Products at the price contemplated by the Agreement. But the question of whether Frontier was willing to sell the Frontier Products in the manner set forth in the Agreement is entirely distinct from whether the Agreement bound Bonchon to

purchaser, and logistical information for the shipping and delivery of the products.

purchase certain quantities of Frontier Products. For the reasons set forth above, the Agreement did not.

Frontier also reasons that Bonchon can be bound by the Agreement despite its lack of clarity as to whether the agreement bound Bonchon, its franchisees, or the Distributors, because in the franchise restaurant industry, it is customary for franchisors to contract with suppliers to create a network that distributes products from suppliers to franchisees via distributors while bypassing the franchisor. While that may be so, Frontier does not explain why this industry custom renders Bonchon liable under an agreement that lacks core elements of a binding contract.

Finally, Frontier points to certain other aspects of Bonchon's conduct -- such as its request that Frontier complete vendor information spreadsheets containing certain information -- that it contends created a binding contract. But Frontier does not bring a counterclaim for breach of a binding contract formed by the vendor information spreadsheets. Its breach of contract claim is based on an assertion that the Supply Agreement was a binding contract that required Bonchon to purchase the full quantity of Frontier Products contemplated in the Supply Agreement. For the reasons set forth in this Opinion, the Supply Agreement was not binding. And even if

Frontier had presented a breach of contract claim predicated on the vendor information spreadsheets, it would fail for the same reasons that its claim based on the Supply Agreement fails: the vendor information spreadsheets also lack the language of a binding contract and material terms such as the required quantity and the identity of the purchaser.

**Conclusion**

Bonchon's May 7, 2021 motion for summary judgment is granted. The Clerk of Court shall enter judgment for Bonchon and close this case.

Dated: New York, New York
October 29, 2021

DENISE COTE
United States District Judge